# EXHIBIT D

# EXHIBIT D

Jordan K. Cameron (12051)
**CAMERON RINGWOOD, LC**
6975 South Union Park Avenue
Suite 600
Cottonwood Heights, UT 84047
Telephone: (385) 463-2425
Email: *jordan@cameronringwood.com*

*Attorneys for Plaintiff*

---

## UNITED STATED DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| ORIGINS TECH, INC., a Delaware corporation; SETH BAILEY, a Utah resident; SEAN MILLER, a Washington resident; | Civil No. 2:23-cv-00326-TS-DAO |
| Plaintiff, | |
| vs. | **FIRST AMENDED COMPLAINT** |
| OAK EQUITY HOLDINGS II, LLC, a California limited liability company; LEERIK MURRAY, an individual; OAK HOLDINGS, LLC, a California limited liability company; MELROSE ASSOCIATES, LLC, a California limited liability company; | Judge Ted Stewart  Magistrate Judge Daphne A. Oberg |
| Defendants. | |

Plaintiffs Origins Tech, Inc. ("Origins"), Seth Bailey ("Bailey") and Sean Miller

("Miller"), by and through counsel, hereby complain against Defendants, Oak Equity Holdings

II, LLC ("OEH II"), Oak Holdings, LLC ("OH"), Melrose Associates ("Melrose") and LeErik

Murray ("Murray"), and allege as follows:

<u>**RULE 26(c)(3) TIER 3 DESIGNATION**</u>

This case arises under Tier 3 as described in Rule 26(c)(3) of the Utah Rules of Civil Procedure.

<u>**PARTIES**</u>

1.     Origins is a Delaware business with its principal place of business in Salt Lake County, Utah. Origins is owned by Andorra Holdings, LLC, a Nevada limited liability company, and John Underwood, Sarah Sanger, and LeErik Murray, California residents.

2.     Bailey is a Utah resident who lives and resides in Salt Lake County, Utah.

3.     Miller is a Washington resident.

4.     OEH II is a California limited liability company. On information and belief, each of the members of OEH II are residents of California.

5.     OH is a California limited liability company. On information and belief, each of the members of OH are residents of California.

6.     Melrose is a California limited liability company. On information and belief, each of the members of Melrose are residents of California.

7.     Murray is an individual residing in California.

<u>**JURISDICTION AND VENUE**</u>

8.     This case was originally filed in Utah State Court with jurisdiction pursuant to Utah Code § 78A-5-102 and was removed to this Court by Defendants.

9.     This Court has personal jurisdiction over all Defendants pursuant to: Section 22 of the *Stock Purchase Agreement* between Origins and Murray, which dictates that the Parties

2

"submit to the jurisdiction and venue of, the appropriate state of federal court for the district encompassing [Origin's] principal place of business" which is Utah;  Section 10(b) of the *Consulting Agreement* between Origins, Melrose and Murray, which dictates that "[a]ny and all disputes hereunder shall be resolved solely and exclusively in the state of federal courts in Salt Lake County, Utah"; Section 8.f of the *Indemnification Agreement* between Origins and OH, LLC, which dictates that "the courts of the State of Utah are to have jurisdiction to decide and settlement any dispute or claims arising out of or in connection with this Agreement";  Section 9 of the *Purchase Option Agreement* between Origins, Murray and OEH II, which dictates that Plaintiff and Defendants "submit to the jurisdiction and venue of, the appropriate state of federal court for the district encompassing [Plaintiff's] principal place of business"; and the Defendants' purposeful direction of contact aimed at Utah residents which caused harm in Utah.

10.    Venue is proper pursuant to Utah Code §§ 78B-3-304, 307.

## ALLEGATIONS

11.    On April 27, 2021, Origins entered into a *Purchase Option Agreement* with Murray, John Underwood, Sarah Sanger, and OEH II.

12.    Murray, Underwood and Sanger collectively owned 100% of OEH II.

13.    OEH II was a party beneficiary and signatory to the *Purchase Option Agreement*.

14.    In correlation with the *Purchase Option Agreement* and other associated agreements including the *Stock Purchase Agreement*, Murray became a shareholder of Origins.

15.    Pursuant to Section 2 of the *Purchase Option Agreement*, Origins agreed to lend to OEH II "from time to time, on terms to be mutually agreed upon . . . all amounts necessary for [OEH II] to open a certain retail business opportunity in San Francisco."

3

16.    The San Francisco retail business opportunity is a licensed cannabis retailer identified as Lombard Street Equity, LLC ("Lombard Street").

17.    OEH II never acquired its own bank accounts. Therefore, OEH II, including through Murray, its manager, directed that money to be loaned to OEH II, pursuant to Section 2 of the *Purchase Option Agreement*, should be deposited directly with Lombard Street.

18.    Since May 2021, Plaintiff has loaned OEH II at least $875,000 through deposits made directly with Lombard Street. However, neither OEH II nor Lombard Street has made a single payment.

19.    The terms of the loan included monthly interest only payment at 10% per annum, the Utah statutory rate.

20.    Borrower's failure to make the interest payments would allow Origins to call all amounts due.

21.    OEH II owes Origins Tech at least $139,819 in unpaid interest.

22.    Origins has called the amounts due, but OEH II has failed to make a single payment toward the balance.

23.    Amounts due total $1,014,819.

24.    Murray, as acting manager of OEH II, has instructed or otherwise caused OEH II not to make payments due to Origins in breach of his fiduciary duties, based on a personal vendetta against Miller and Bailey, current and former operators of Origins.

25.    On April 27, 2021, Origins entered into the *Stock Purchase Agreement* with Murray and others.

4

26.     Murray controlled the negotiation of the *Stock Purchase Agreement* on behalf of the purchasers.

27.     In exchange for granting stock in Origins to the purchasers including Murray, Origins was to receive Murray and others' interests in and to Oak Equity Holdings, LLC (a non-party to this litigation) in addition to all of Oak Equity Holding's assets and intellectual property.

28.     Oak Equity Holding's assets included, as examples, three cannabis licenses for retail stores, and intellectual property for the brand Rose Mary Jane such as trademarks, websites, and social media.

29.     As an inducement to Origins' entering into the *Stock Purchase Agreement*, during the negotiations that took place in Spring 2021, Murray made the following representations regarding Oak Equity Holdings and the operations of its subsidiary entities (i.e., the cannabis retail locations), which he knew to be false at the time he made them, or were otherwise made recklessly without proper investigation and diligence:

   a.   That Murray and his team were the foremost experts in Bay Area cannabis operations, when in fact they had little to no experience or success.

   b.   That purported revenue models Murray presented as part of the negotiation were from other partners and clients and reflected true revenue projections, when in fact they over-stated revenues by a substantial factor.

   c.   That a proforma presented by Murray including financial investment expectations for the three Oak Equity cannabis licenses was a "very conservative" estimate based on demographics, populations, spending, actual historic performance and

experience, when in fact the licenses and retail locations would require millions of dollars of investment to become operational.

d.   That the three stores holding licenses were ready to be immediately operational, when in fact every license was years away from being able to become operational due to city requirements and each license would cost hundreds of thousands of dollars to carry while completing permitting.

e.   That the store opening plan provided by Murray was feasible and accurate, when in fact the store openings were not possible due to licensing issues. Some of the stores have yet to open due to issues that pre-dated the Parties' transaction of which Murray was aware but did not disclose.

f.   That given his real estate acumen and experience, Murray could secure lease agreements with preferential, below market rates. In fact, Murray had already secured leases with a landlord ("Landlord") with whom he had a pecuniary interest (further described below), at above-market rates, and concealed this relationship and his pecuniary interest from Origins. Murray further concealed the acquisition from Landlord causing additional financial harm and inability to re-negotiate leases.

30.   Inherent in the stock purchase transaction was the representation that Oak Equity Holdings had a value of at least $5,000,000. In fact, Oak Equity Holdings had no value as its cannabis licenses were not in use, its stores were not open, and they could not be opened or be operationalized without significant legwork vis-à-vis city social equity requirements, store modifications and improvements, and substantial time and capital investment.

6

31.     Although Murray knew it at the time, he did not disclose to Origins that Oak Equity Holdings would require substantial additional work and financial investment in order to monetize any aspect of the business—which investment were almost certain to eclipse its value.

32.     Had Murray disclosed these material facts, Origins would not have gone through with the transaction.

33.     As stated, the *Stock Purchase Agreement* required the transfer of all "intellectual property relating" to the business.

34.     However, Murray never transferred the Rose Mary Jane social media accounts, website domains, or the websites themselves, which assets he controlled, despite repeated requests by Origins. Further, he purposefully concealed upcoming bills and renewals related to the digital assets in a deliberate effort to harm the company.

35.     In today's day and age, primary consumer contact comes through social media and websites. Without access to, or control of, the Rose Mary Jane social media and websites, Origins was unable to successfully reach its customer market, interact with existing followers and consumers, or enhance its online marketing strategies to grow the business.

36.     Murray's failure and refusal to transfer the accounts and websites harmed Origins' ability to grow the business and interfered with the smooth transition and operation of business.

37.     Through the *Stock Purchase Agreement* itself, Murray represented and warranted that none of the transferred property (e.g., cannabis licenses tied to the stores) was encumbered, and that he had not granted any right to acquire and portion of the property to any third party.

38.     The representations and warranties were a material inducement for Origins'

entering into the *Stock Purchase Agreement* and the associated *Indemnification Agreement*

discussed below.

39.     In fact, Murray had pledged all right, title and interest in and to the cannabis retail

license held by Lake Merritt (one of Oak Equity Holdings' subsidiary stores, and one of the

assets to be transferred to Origins), all proceeds of the sale or other disposition thereof, and an

option to purchase 5% of Oak Equity Holdings, to the Landlord.

40.     At the time of the negotiations, Murray acted as a property manager for the

Landlord with whom he had secured leases for the properties subject to the transaction. On

information and belief, Murray's fee was a percentage of rents and value created if the property

were sold. Accordingly, Murray was incentivized to lock the tenants into long term, above-

market lease agreements, and cause inflated tenant improvements resulting in payments by

Origins of more than $500,000 over budget, in order to benefit himself financially. In later

dealings (i.e., after all contracts had been entered) Murray held himself out as the Landlord

(which indicates an even closer relationship which was never disclosed) in invading the retail

stores, disrupting their quiet enjoyment, and demanding inventory inspections.

41.     One of the primary assets at issue in the transaction (i.e., the Lake Merritt

cannabis license) had been encumbered as part of a self-serving transaction of Murray prior to

the transaction and the representation and warranty that assets would be unencumbered was false

and Murray knew it was false.

42.     As part of his undisclosed self-dealing, prior to the *Stock Purchase Agreement*

and *Indemnification Agreement*, Murray had negotiated *Commercial Leases* for the cannabis

retail locations with Landlord which included predatory rates, which Murray knew were not commensurate with market rates.

43.    In this way, Murray was guaranteeing higher commissions for himself through exorbitant lease payments while permanently hamstringing the businesses he was selling to Origins.

44.    At all times, Murray had a pecuniary interest in the transactions with Landlord and profited from inflated lease rates and the security pledge. Murray never disclosed his conflict of interest to Origins.

45.    The predatory *Commercial Leases* coupled with the guarantees made by Murray described herein below created a circumstance wherein Origins would never be able to renegotiate a fair lease which would allow them to successfully operate the business.

46.    Also as part of his self-dealing, Murray had entered into a *Limited Guaranty* with Landlord causing OH (a company Murray controls) to guarantee all of Tenant's payment obligations under the *Commercial Lease*—thereby further guaranteeing money for himself and interfering with Origins' ability to directly communicate with Landlord to renegotiate the lease.

47.    Murray concealed the fact of this security pledge and the *Limited Guaranty* from Plaintiffs despite it having a material adverse impact on the value transferred assets and future success of the operations.

48.    As part of this transaction, Origins was further induced to enter into an *Indemnification Agreement* with Defendant OH, who is the party to the aforementioned *Limited Guaranty*.

49.     Murray was using the assets that formed part of the *Stock Purchase* transaction to guaranty and secure money to be paid to Landlord with whom Murray had a pecuniary interest. But Murray never disclosed the fact of his self-dealing and conflicted position to Plaintiffs.

50.     Murray did not disclose his relationship with Landlord or the guarantee prior to Origins' agreement to enter into the *Stock Purchase Agreement* and the *Indemnification Agreement*. Had Origins known of Murray's relationship with Landlord and the terms of the *Limited Guaranty*, it would not have entered into the *Indemnification Agreement*.

51.     Simply, Origins was duped by Murray to accept indemnification obligations of the *Indemnification Agreement* through Murrays' false statements and concealment of material facts.

52.     Due to the position Murray was acquiring within Origins as shareholder and consultant, Murray had a duty to disclose his various conflicts, self-interested transactions, and pecuniary interests which conflicted with Origins' interests, but never did.

53.     On April 23, 2021, Origins entered into a *Consulting Agreement* with Melrose Associates LLC, another entity controlled by Murray.

54.     Pursuant to the *Consulting Agreement*, Murray was appointed as a consultant for Origins.

55.     Murray accepted the appointment and the obligations of the *Consulting Agreement*.

56.     In accepting appointment as consultant, Murray agreed to be bound to the terms of the *Consulting Agreement* and became a party thereto.

57.     The recitals set forth in the *Consulting Agreement* claimed consultant to be a successful business owner and manager with experience regarding business development, strategic planning, marketing and sales strategies. This is false.

58.     The *Consulting Agreement* required Murray to take responsibility for "the development and leadership of the California market and Rose Mary Jane brand, business development efforts to identify and secure new locations and licenses in new markets . . . and developing and managing [Origins'] social equity and social justice programs and partnerships." (*Consulting Agreement* at Schedule A).

59.     It further required consultant to act loyally, faithfully, and conscientiously to Origins' interest.

60.     The *Consulting Agreement* also contained restrictions against the disclosure of Origins' confidential information which was defined broadly to include, as examples: "Results of operations or any other financial information of" Origins, and "any information which is generally regarded as confidential in any industry or line of business in which [Origins] is engaged . . . ." (*Consulting Agreement* at ¶ 5).

61.     Rather than fulfilling his obligations, at every turn, Murray consistently interfered with Origins' progress, used and disclosed confidential information to suit his own personal interest (such as described herein regarding the New Jersey Deal), exposed Origins' confidential financial information to Landlord in an effort to create discord and distrust between Origins' subsidiary entities and Landlord, failed and refused to participate in the development and management of social equity programs and instead made false reports to the City of Oakland and

news reporters regarding Origins' alleged failure to develop such programs when in fact, it was Murray's sole obligation.

62.     In 2021, Origins was in negotiations to expand its operations into New Jersey through the acquisition of a cannabis license there ("New Jersey Deal").

63.     Origins spent considerable money on attorneys, consultants, travel and sponsoring events in furtherance of the New Jersey Deal.

64.     Murray was involved in the negotiations as the designated Consultant pursuant to the *Consulting Agreement*. In such capacity, Murray interfaced with the potential New Jersey partners.

65.     Holding himself out as a decision maker, Murray, without seeking board consent from Origins, unilaterally canceled the New Jersey Deal and made defamatory statements (such as those described herein below) against Origins, Miller and Bailey based on his personal vendetta against Miller and Bailey.

66.     Murray refused to provide Plaintiffs with contact information for the potential New Jersey partners.

67.     Plaintiffs were unable to salvage the New Jersey Deal, which would have resulted in significant profits to Origins of between $4,000,000 and $8,000,000 dollars.

68.     On information and belief, Murray circumvented and usurped Origins' business opportunity vis-à-vis the New Jersey Deal for himself.

69.     Within the last year, Murray has published false statements to Origin's vendors, others associates, and other potential business partners, claiming Miller and Bailey have no

morals or ethics, and that Murray no longer has any involvement in the business, which claims were false.

70.     Murray published additional false statements to social equity partners, specifically of Lombard Street and Lake Merritt, including that the Miller and Bailey were intent on taking advantage of their position and cutting them out of the business altogether. The social equity partners are also decision makers vis-à-vis use of business funds, including repayment of loans described herein above.

71.     In 2023, Murray met with a reporter to provide information pertaining to Origins' business operations in Oakland California.

72.     Murray provided false information to the reporter with the intent that it be published to a widespread audience. At the time Murray made the statements, he knew they were false, yet he intended that they be published with the purpose of harming Miller and Bailey's reputations and ongoing and future business interests and relationships.

73.     For example, Murray lied in stating "[Miller and Bailey] came in saying how much they supported our vision for RMJ and would provide all the capital to fund the vision, open the stores, and support social equity."  Murray further commented "But less than a year later, it became apparent that [Miller and Bailey] had essentially lied to us about everything — and never fully intended to comply with the many contracts around opening, funding, and operating the stores in accordance with the social equity program and in accordance with the law."

74.     What Murray failed to state was that it was his contractual obligation to develop the social equity program and that he failed to do so. That he places blame for his failures on

Miller and Bailey constitutes a false statement designed to malign and defame Miller and Bailey

and subject them to unwarranted scrutiny and scorn by the consuming public, the City of

Oakland, and anyone else within the article's reach.

75.     Murray also lied in stating "Miller and Bailey used Origins' assets to fund

personal, illicit private ventures without informing shareholders." Murray further accused Miller

and Bailey of willful, malicious, wanton and oppressive conduct.

76.     The statements against Miller and Bailey are of conduct that is incongruous with

the operation of lawful business such as deceit, misuse/misappropriation of funds and fraud.

77.     On information and belief, the purpose of Murray's defamatory statements were,

*inter alia*, to disrupt Plaintiffs' business and interfere with their relationships and cause Plaintiffs

to suffer ridicule and scorn.

78.     Murray further engaged in conduct constituting unlawful blackmail wherein

Murray demanded that unless Plaintiffs paid Murray $2,000,000, he would make false claims

against Plaintiffs to the city of Oakland regarding Origins' business operation in order to get

cannabis licenses revoked, and further interfere with Plaintiffs' economic interests.

79.     The foregoing are but a few examples of Murray's extensive efforts to harm

Plaintiffs financially, including interfering with their economic relations.

## **FIRST CAUSE OF ACTION**
(Promissory Estoppel)
By Origins against OEH II)

80.     Origins hereby incorporates by reference each of the foregoing paragraphs.

81.    In exchange for Origin's willingness to loan money to OEH II's retail business endeavors, OEH II promised to pay Origins all loaned amounts plus monthly interest only payments at the rate of 10% per annum, until Origins called the loan due.

82.    OEH II knew or should have known that foregoing promise would entice Origins to make loans as directed by OEH II and for OEH II's benefit.

83.    Origins reasonably relied on the OEH II's promise when it loaned hundreds of thousands of dollars to OEH II through Lombard Street.

84.    Thereafter, OEH II failed to honor its promises by failing and refusing to pay interest accrued on the loaned amounts.

85.    The broken promise resulted in substantial financial damage to Origins in an amount to be determine, but not less than $1,014,819.

86.    OEH II should be estopped from denying Origins the benefits of their promise.

87.    Origins is entitled to an award of damages against OEH II in an amount to be determined at trial, but not less than $1,014,819, together with pre and post judgment interest at the rate of 10% per annum, and Plaintiff's reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
(Contract Implied in Fact
By Origins against OEH II)

88.    Origins hereby incorporates by reference each of the foregoing paragraphs.

89.    OEH II desired that Origins loan money for its benefit directly to Lombard Street to assist OEH II with its retail business endeavors.

90.    OEH II further agreed that it would pay interest on loaned amounts at the rate of 10% per annum each month until Origins called the loans due.

91.     OEH II further agreed that it would repay the loaned amounts.

92.     At OEH II's request and direction, Origins deposited hundreds of thousands of

dollars directly with Lombard Street.

93.     Origins expected OEH II to compensate it by paying accrued interest and

ultimately, by repaying amounts loaned.

94.     OEH II knew or should have known that Origins expected the foregoing payment.

95.     Plaintiff's contribution to OEH II through Lombard Street materially benefited

OEH II by making it possible to operate the business and the pursue its retail endeavors.

96.     OEH II has failed or refused to pay Origins.

97.     The amount the parties intended as compensation to Origins under the contract is

all amounts deposited at OEH II's direction with Lombard Street, plus interest at the rate of 10%

per annum.

98.     Wherefore, Origins requests judgment against OEH IIs in an amount to be

determined at trial, but not less than $1,014,819, plus pre and post-judgment interest, reasonable

attorneys' fees and court costs, and all other relief that is proper, just, or equitable.

### **THIRD CAUSE OF ACTION**
(Breach of Contract, *Purchase Option Agreement*
By Origins against OEH II)

99.     Origins hereby incorporates by reference each of the foregoing paragraphs.

100.    Origins entered into a valid and enforceable agreement with OEH II in the form of

the *Purchase Option Agreement*.

101.    Pursuant to Section 2 of the *Purchase Option Agreement*, Origins agreed to lend to OEH II "from time to time, on terms to be mutually agreed upon . . . all amounts necessary for [OEH II] to open a certain retail business opportunity in San Francisco."

102.    The mutually agreed terms include:

    a.    Plaintiff would loan money for OEH II's benefit, by depositing money at OEH II's direction directly with Lombard Street.

    b.    Interest would accrue on any loan at the rate of 10% per annum.

    c.    Interest was payable on a monthly basis, on the first day of each month.

    d.    Origins could call the loan due in its discretion.

103.    Origins fulfilled its obligations by depositing hundreds of thousands of dollars for the benefit of OEH II and at OEH II's direction with Lombard Street.

104.    OEH II materially breached all of its obligations and/or responsibilities by failing to pay interest and failing to pay amounts loaned after Origins called the loan due.

105.    As a proximate result of OEH II's foregoing breaches, Origins has been harmed and/or damaged in a manner and amount to be determined, but not less than $1,014,819.

106.    Origins is entitled to an award of damages against OEH II in an amount to be determined at trial, together with its reasonable attorneys' fees and costs, but not less than $1,014,819.

## FOURTH CAUSE OF ACTION
(Breach of the Implied Covenant of Good Faith and Fair Dealing, *Purchase Option Agreement* By Origins against OEH II)

107.    Origins hereby incorporates by reference each of the foregoing paragraphs.

108.    Inherent in the *Purchase Option Agreement* between Origins and OEH II is an

implied covenant of good faith and fair dealing. Specifically, that Origins would receive the fruits of the benefit it conferred on OEH II by loaning money as OEH II directed.

109.    None of OEH II's conduct was consistent with the agreed common purpose and justified expectations of Origins and based upon the dealings of the parties.

110.    For example, OEH II has materially breached the implied covenant of good faith and fair dealing by, among other things, refusing to meet its obligations and by ignoring Origins' demands for payment.

111.    As a direct and proximate result of OEH II's foregoing misconduct, Origins has been damaged in a manner and amount to be determined, but not less than $1,014,819.

112.    Origins is entitled to an award of damages against OEH II in an amount to be determined at trial, together with its reasonable attorneys' fees and costs, but not less than $1,014,819.

### FIFTH CAUSE OF ACTION
(Tortious Interference
By Origins, Miller and Bailey against Murray)

113.    Plaintiffs hereby incorporates by reference each of the foregoing paragraphs.

114.    Murray intentionally interfered, and continues to interfere, with Plaintiffs' existing and potential economic relations.

115.    Murray's interference is through improper means, including but not limited to: Murray's making false statements about Plaintiffs to decision makers of Lombard Street and Lake Merritt; Murray's directing OEH II not to make payments on loaned amounts as the result of a personal vendetta; Murray's false or otherwise inaccurate representations to social equity partners, city officials, and consumers regarding Plaintiffs and their business practices; Murray's

self-dealing and conflicts of interest vis-à-vis Landlord and Origins as described in the general allegations above; Murray causing inflated tenant improvements resulting in payments by Origins of more than $500,000 over budget.

116.    Murray's interference has proximately caused injury to Plaintiffs' business, including interfering with its collection of $1,014,819.

117.    Murray further interfered with Plaintiffs' expansion into New Jersey and usurped the opportunity for himself, as described in the general allegations above.

118.    Murray's interference has also proximately caused injury to Plaintiffs' business, including interfering with its expansion efforts into New Jersey, causing between $4,000,000 and $8,000,000 in financial losses to Plaintiff.

119.    Murray's interference has further caused a total loss of value of Oak Equity Holdings and its various cannabis licenses in an amount of not less than $5,000,000.

120.    Plaintiffs are entitled to damages in an amount to be determined at trial and an award of punitive damages.

### SIXTH CAUSE OF ACTION
(Breach of Contract, *Consulting Agreement* or alternatively, Contract Implied in Fact
By Origins against Murray and Melrose)

121.    Origins hereby incorporates by reference each of the foregoing paragraphs.

122.    Origins entered into a valid and enforceable agreement with Melrose and Murray in the form of the *Consulting Agreement*.

123.    Though Murray was not a signatory to the *Consulting Agreement*, he accepted appointment as consultant, accepted the terms of the *Consulting Agreement*, and undertook to

perform the obligations of a consultant as outlined in the *Consulting Agreement* on behalf of Melrose.

124.    The terms of the *Consulting Agreement* included the following:

a.    That Murray and Melrose would take responsibility for "the development and leadership of the California market and Rose Mary Jane brand, business development efforts to identify and secure new locations and licenses in new markets . . . and developing and managing [Origins'] social equity and social justice programs and partnerships."

b.    That Murray and Melrose would act loyally, faithfully, and conscientiously to Origins' interest.

c.    That Murray and Melrose would maintain confidentiality of Origins' business plans, financial information, and "any information which is generally regarded as confidential in any industry or line of business in which [Origins] is engaged . . . ."

125.    Conversely, Origins fulfilled its obligations by paying the money required of the *Consulting Agreement*, providing access to confidential information to Murray, and involving Murray in the operations of the business.

126.    Rather than fulfilling their obligations, at every turn, Murray and Melrose, acting in concert with each other, consistently interfered with Origin's progress, used and disclosed confidential information to suit their own personal interests (such as described herein regarding the New Jersey Deal), exposed Origins' confidential financial information to Landlord in an effort to create discord and distrust, between Origins' subsidiary entities and Landlord, failed and

refused to participate in the development and management of social equity programs and instead, made false reports to the City of Oakland regarding Origins' alleged failure to develop such programs when in fact, it was Murray's sole obligation.

127.    Alternatively, the relationship that existed between Origins and Murray as consultant pursuant to the *Consulting Agreement* constituted a contract implied in fact with all the same terms as set forth in the *Consulting Agreement*.

128.    Murray breached the contract in the ways set forth herein above.

129.    Origins is entitled to an award of damages against Murray and Melrose in an amount to be determined at trial, together with its reasonable attorneys' fees and costs.

**SEVENTH CAUSE OF ACTION**
(Breach of the Implied Covenant of Good Faith and Fair Dealing, *Consulting Agreement*
By Origins against Murray and Melrose)

130.    Origins hereby incorporates by reference each of the foregoing paragraphs

131.    Inherent in the *Consulting Agreement*, whether express or implied in fact, is an implied covenant of good faith and fair dealing. Specifically, that Origins would receive the intended benefit of the bargain.

132.    Specifically, that Murray and Melrose would apply their acumen to help grow the business, find expansion opportunities, and bring value to the business.

133.    However, none of Murray or Melrose's conduct was consistent with the agreed common purpose and justified expectations of Origins based upon the dealings of the parties.

134.    For example, Murray and Melrose have materially breached the implied covenant of good faith and fair dealing by, among other things, refusing to meet their obligations and by

consistently hindering Origin's progress and expansion, and by usurping opportunities of the business for themselves, such as the New Jersey Deal.

135.    As a direct and proximate result of Murray and Melrose's foregoing misconduct, Origins has been damaged in a manner and amount to be determined at trial.

136.    Origins is entitled to an award of damages against each of Murray and Melrose in an amount to be determined at trial, together with its reasonable attorneys' fees and costs as set forth in Section 10.c. of the *Consulting Agreement*.

**EIGHTH CAUSE OF ACTION**
(Fraudulent Inducement, *Indemnification Agreement*
By Origins against Murray and Oak Holdings)

137.    Origins hereby incorporates by reference each of the foregoing paragraphs.

138.    As an inducement to Origins' entering into the *Indemnification Agreement*, during the negotiations that took place in Spring 2021, Murray made the following representations regarding Oak Equity Holdings and the operations of its subsidiary entities, which he knew to be false at the time he made them, or were otherwise made recklessly without proper investigation and diligence:

a.    That Murray and his team were the foremost experts in Bay Area cannabis operations, when in fact they had little to no experience or success.

b.    That purported revenue models Murray presented as part of the negotiation were from other partners and clients and reflected true revenue projections, when in fact they over-stated revenues by a substantial factor.

c.    That a proforma presented by Murray including financial investment expectations for the three Oak Equity cannabis licenses was a conservative estimate based on

22

actual historic performance and experience, when in fact the licenses and retail

locations would require millions of dollars of investment to become operational.

d.   That the three stores holding licenses were ready to be immediately operational,

when in fact every license was years away from being able to become operational

due to city requirements and each license would cost hundreds of thousands of

dollars to carry while completing permitting.

e.   That the store opening plan provided by Murray was feasible and accurate, when

in fact the store openings were not possible due to licensing issues. Some of the

stores have yet to open due to issues that pre-dated the Parties' transaction of

which Murray was aware but did not disclose.

f.   That given his real estate acumen and experience, Murray could secure lease

agreements with preferential, below market rates. In fact, Murray had already

secured leases with a landlord ("Landlord") with whom he had a pecuniary

interest (further described below), at above-market rates, and concealed this

relationship and his pecuniary interest from Origins.

139.    Inherent in the transaction was the representation that Oak Equity Holdings had a

value of at least $5,000,000. In fact, Oak Equity Holdings had no value as its cannabis licenses

were not in use, its stores were not open, and they could not be opened or be operationalized

without significant legwork vis-à-vis city social equity requirements, and substantial time and

capital investment.

140.    The representations were false, and Murray knew they were false at the time they were made, or Murray made the representations recklessly without sufficient knowledge upon which to base the representations.

141.    The representations made by Murray were about presently existing facts that were important and material to Origins' contracting with OH and entering into the *Indemnification Agreement*.

142.    Also during the early 2021 negotiations, Murray concealed many material facts and circumstances including:

    a.  His relationship and self-dealing involving Landlord as set forth in detail herein above which resulted in predatory lease amounts which permanently hamstrung the business operations;

    b.  His various side deals that acted as encumbrances against the purchase assets. For example, Murray promised (but never disclosed to Origins prior to the deal) that all grants and loans obtained by the stores would go directly to social equity partners and that the company would assume liability for the same.

    c.  That he had encumbered valuable assets, such as cannabis licenses, by providing security grants in the same to Landlord.

    d.  That he had guaranteed lease payments (which obligations he intended to pass onto Origins, without disclosing the same) on the predatory leases.

143.    Due to the position Murray was acquiring within Origins as shareholder and consultant, Murray had a duty to disclose his various conflicts, self-interested transactions, and pecuniary interests which conflicted with Origins' interests, but never disclosed the same.

144.    Murray's omissions were material because they led Origins to believe that it should contract with OH and accept the indemnity obligations in the best interest of the company.

145.    Murray made the representations and omissions described above for the purpose of inducing Origins to act upon them in entering into the *Indemnification Agreement*.

146.    Plaintiff reasonably relied on Murray's express and implied representations without knowledge of their falsity and material incompleteness and were thereby induced to act in the manner described above.

147.    Only after Origins had contracted with OH did Origins learn of the misrepresentation and material omissions.

148.    Origins would not have acted affirmatively by contracting with OH had it known that the representations were false and incomplete.

149.    The misrepresentations and omissions can be construed against OH based on Murray's position of control within the company, and can also be construed against Murray personally who made the representations to advance his undisclosed self-dealing and personal enrichment.

150.    As a proximate result of Murray and OH's fraudulent conduct, Origins has been damaged.

151.    As a remedy for Murray and OH's fraudulent inducement, Origins seeks rescission of the *Indemnification Agreement* and that it be voided ab initio.

152.     Wherefore, Origins request a declaration and order that *the Indemnification Agreement* is void ab initio, that Origins has no obligations owing to OH or any others pursuant to the *Indemnification Agreement*.

153.     Origins further requests an award of its reasonable attorneys' fees and court costs, and all other relief that is proper, just, or equitable.

## NINTH CAUSE OF ACTION
(Defamation Per Se
By Miller against Murray)

154.     Miller hereby incorporates by reference each of the foregoing paragraphs.

155.     Murray published false statements about Miller in conversations, and a news article including as examples:

a.     That Miller has no morals or ethics.

b.     That Miller was intent on taking advantage of social equity partners' positions and cutting them out of the business altogether.

c.     That Miller promised to provide all the capital to fund the vision, open the stores, and support social equity, but less than a year later, Miller had essentially lied to all parties about everything, and never fully intended to comply with the many contracts around opening, funding, and operating the stores in accordance with the social equity program and in accordance with the law.

d.     That Miller used Origins' assets to fund personal, illicit private ventures without informing shareholders.

e.     That Miller engaged willful, malicious, wanton and oppressive conduct.

156.    At the time Murray published the statements, he knew or should have known through reasonable investigation, that the statements were false and/or materially misleading.

157.    Murray's statements were not subject to any privilege, or any privilege was waived as the result of the malicious purpose of the statements and/or through the methods used for publication.

158.    The statements include, or can be interpreted to include, that Miller engaged in actions incongruous with the operation of lawful business.

159.    As the direct and proximate result of Murray's conduct, Miller has been damages by the statements in an amount to be determined at trial.

### TENTH CAUSE OF ACTION
(Defamation Per Se
By Bailey against Murray)

160.    Bailey hereby incorporates by reference each of the foregoing paragraphs.

161.    Murray published false statements about Bailey in conversations, and a news article including as examples:

    a.    That Bailey has no morals or ethics.

    b.    That Bailey was intent on taking advantage of social equity partners' positions and cutting them out of the business altogether.

    c.    That Bailey promised to provide all the capital to fund the vision, open the stores, and support social equity, but less than a year later, Bailey had essentially lied to all parties about everything, and never fully intended to comply with the many contracts around opening, funding, and operating the stores in accordance with the social equity program and in accordance with the law.

    d.   That Bailey used Origins' assets to fund personal, illicit private ventures without informing shareholders.

    e.   That Bailey engaged willful, malicious, wanton and oppressive conduct.

162.   At the time Murray published the statements, he knew or should have known through reasonable investigation, that the statements were false and/or materially misleading.

163.   Murray's statements were not subject to any privilege, or any privilege was waived as the result of the malicious purpose of the statements and/or through the methods used for publication.

164.   The statements include, or can be interpreted to include, that Bailey engaged in actions incongruous with the operation of lawful business.

165.   As the direct and proximate result of Murray's conduct, Bailey has been damaged by the statements in an amount to be determined at trial.

### ELEVENTH CAUSE OF ACTION
(Breach of the *Stock Purchase Agreement*
By Origins against Murray)

166.   Origins hereby incorporates by reference each of the foregoing paragraphs.

167.   Origins entered into a valid and enforceable agreement with Murray in the form of the *Stock Purchase Agreement*.

168.   Pursuant to the *Stock Purchase Agreement* which granted stock in Origins to Murray, Origins was to receive Murray and others' interests in and to Oak Equity Holdings, LLC (a non-party to this litigation) in addition to all of Oak Equity Holding's assets and intellectual property.

169.    However, the social media accounts, website domains, and websites, which were at all times owned and controlled by Murray, were never transferred to Origins despite repeated requests by Origins.

170.    Murray's failure and refusal to transfer the accounts and websites harmed Origins' ability to grow the business and interfered with the smooth transition and operation of business.

171.    Additionally, through the *Stock Purchase Agreement*, Murray represented and warranted that none of the transferred property (e.g., cannabis licenses tied to the stores) was encumbered, and that he had not granted any right to acquire and portion of the property to any third party.

172.    The representations and warranties were a material inducement for Origins' entering into the *Stock Purchase Agreement*.

173.    In fact, prior to entering into the *Stock Purchase Agreement,* Murray had pledged all right, title and interest in, the cannabis retail license held by Lake Merritt (one of Oak Equity Holdings' subsidiary stores, and one of the assets to be transferred to Origins) to Landlord, as well as all proceeds of the sale or other disposition thereof.

174.    In other words, one of the primary assets at issue in the transaction had been encumbered prior to the transaction as a security pledge to Landlord and the representation and warranty to the contrary was false.

175.    Murray materially breached the *Stock Purchase Agreement* by failing to transfer all intellectual property to Origins and by causing the transfer of encumbered assets to Origins.

176.     Murray's breaches of the *Stock Purchase Agreement* proximately harmed Origins in an amount to be determined at trial.

177.     Origins is entitled to an award of damages against Murray in an amount to be determined at trial, together with its reasonable attorneys' fees and costs.

<u>**TWELFTH CAUSE OF ACTION**</u>
(Breach of the Implied Covenant of Good Faith and Fair Dealing, *Stock Purchase Agreement* By Origins against Murray)

178.     Origins hereby incorporates by reference each of the foregoing paragraphs.

179.     Inherent in the *Stock Purchase Agreement* is an implied covenant of good faith and fair dealing. Specifically, that Origins would receive the intended benefit of the bargain.

180.     Specifically, that Murray would transfer an unencumbered turn-key cannabis operation, with attendant intellectual property, all of significant value, to Origins.

181.     However, none of Murray's conduct was consistent with the agreed common purpose and justified expectations of Origins based upon the dealings of the parties.

182.     For example, Murray has materially breached the implied covenant of good faith and fair dealing by, among other things, refusing to meet their obligations and by consistently hindering Origins' progress and expansion, failing and refusing to transfer the required property, and taking active measures to damage to value of the business.

183.     As a direct and proximate result of Murray's foregoing misconduct, Origins has been damaged in a manner and amount to be determined at trial.

184.     Origins is entitled to an award of damages against Murray in an amount to be determined at trial, together with its reasonable attorneys' fees and costs as set forth in *Stock Purchase Agreement*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief as follows:

A.      For entry of judgment and an award of damages in favor of Origins against Defendant OEH II in an amount to be proven at trial, but not less than $1,014,819 plus interest at the rate of 10% per annum for breach of the *Purchase Option Agreement* or alternatively, its promise to repay loaned money with interest.

B.      For entry of judgment and an award of damages in favor of Origins against Defendant Murray in an amount to be proven at trial, but not less than $1,014,819 plus interest at the rate of 10% per annum for his interference with contracts, at least $4,000,000 for his interference with business expansion in New Jersey, and at least $5,000,000 for the total loss of value of Oak Equity Holdings' business operations.

C.      Rescission of the *Indemnification Agreement* and the declaration from the Court that the *Indemnification Agreement* is void ab initio and Origins has no obligations to any party arising therefrom.

D.      For entry of judgment and an award of damages in favor of Miller against Defendant Murray in an amount to be proven at trial for Murray's defamation of Miller.

E.      For entry of judgment and an award of damages in favor of Bailey against Defendant Murray in an amount to be proven at trial for Murray's defamation of Bailey.

F.      For entry of judgment and an award of damages in favor of Origins against Defendant Murray and Melrose, jointly and severally, in an amount to be proven at trial, for breach of the *Consulting Agreement*.

G.  For entry of judgment and an award of damages in favor of Origins against Defendant Murray in an amount to be proven at trial, for breach of the *Stock Purchase Agreement*.

H.  Punitive damages against Murray for his fraudulent statements and omissions which induced Origins to enter into the various contracts.

I.  Attorneys' fees and cost associated with bringing this action; and

J.  Such other and further relief as the Court deems just and equitable.

DATED:  January 2, 2024.

CAMERON RINGWOOD, LC

By:  /s/ Jordan K. Cameron
Jordan K. Cameron
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Jordan K. Cameron, certify that on this 2ⁿᵈ day of January 2024, I caused a true and correct copy of the foregoing to be served on the following via Electronic Filing:

Jose Abarca
jabarca@polsinelli.com
Attorney for Defendants


_____/s/ Jordan K. Cameron_____